UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:09-CV-871-H

JAMES O'NEILL and
ANGELA O'NEILL                                                                    PLAINTIFFS

V.

LOUISVILLE JEFFERSON COUNTY                                                       DEFENDANTS
METRO GOVERNMENT, et al.

**MEMORANDUM OPINION**

Plaintiffs brought this action claiming numerous federal constitutional and state law violations as a result of Louisville Metro Animal Services ("LMAS") impounding their dogs and puppies. Defendants are: (1) Louisville Jefferson County Metro Government ("Metro"); (2) LMAS;[1] (3) Dr. Giles Meloche, the former director of LMAS; (4)Wayne Zelinsky, the former assistant-director of LMAS; (5) Andrea Pendleton, an LMAS officer; and (6) unknown LMAS officers involved in the impoundment of Plaintiffs' animals (all Defendants collectively referred to as "Defendants"). All individual defendants have been sued in both their personal and official capacities.[2] At this time, the following motions are pending before the Court: (1) Metro's Motion to Dismiss; (2) Plaintiffs' Motion to File an Amended Complaint; (3) Meloche's Motion to Dismiss; (4) Zelinsky's Motion to Dismiss; and (5) all Defendants' Supplemental Motion to

---

[1] The parties agree that LMAS cannot be sued in its own name, but rather Metro is the proper defendant. Thus, the Court will dismiss LMAS from this suit.

[2] Because claims against Metro officers in their official capacities are essentially claims against Metro itself, *see Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985), any reference to claims against Metro will also be directed to claims against the individual defendants in their official capacities. When claims against an individual defendant are referenced, it refers only to the personal capacity claims.

1

Dismiss New Claims. The Court will examine the viability of all claims, including those in the proposed Amended Complaint, and then rule on the motions as appropriate.

**I.**

At this stage of the litigation, all facts are based solely on Plaintiffs' Amended Complaint. All Defendants' arguments assume those facts to be true.

Plaintiffs reside in a residential neighborhood in Louisville, Kentucky. Sometime in 2008, they decided to breed their two two-year old American Bulldogs. This was the first time either Plaintiff had attempted to breed dogs. Admittedly, they did not endeavor to discover whether a license was required for breeding dogs and/or selling puppies and did not obtain such a license. On September 4, 2008, the female dog gave birth to eleven puppies, who were given appropriate veterinary treatment. On October 16, 2008, Plaintiffs placed an advertisement for the sale of their puppies in the Louisville Courier-Journal newspaper. They renewed that advertisement on October 25, 2008 and, by October 30, they had sold four of their puppies.

After examining the advertisement, two LMAS officers phoned Plaintiffs under the guise of being prospective buyers. They scheduled an appointment to see the puppies on October 30, 2008. At that time, the officers knocked on Plaintiffs' door, were invited inside and examined the puppies. The officers told Plaintiffs they would like to step outside to discuss purchasing a puppy. A moment later, the officers knocked on the door. When Plaintiffs opened it, the two undercover officers were joined by several uniformed officers who asked for proof of Plaintiffs' breeder's license. Plaintiffs admitted they did not have one and stated that they did not know one was required. Against Plaintiffs' wishes, the officers re-entered the home and seized the two adult dogs and the seven remaining puppies, telling Plaintiffs that the dogs were being seized

because Plaintiffs lacked the necessary license to sell puppies.

The animals were immediately taken to the LMAS facility on Manslick Road and were kept overnight. The next morning, Plaintiffs went to the facility in an effort to retrieve the animals. There, Plaintiffs were informed that prior to releasing the animals, Metro ordinances required certain actions be completed: (1) Plaintiffs had to pay fees associated with releasing the animals; (2) Plaintiffs had to purchase a breeder's license; (3) the unlicensed, unaltered adult dogs had to be altered; (4) all the animals had to be micro-chipped;[3] and (5) all dogs had to be given proper vaccinations. Plaintiffs objected to these conditions of release and eventually spoke directly with Defendant Meloche. Meloche informed them that under Metro ordinances, LMAS could charge Plaintiffs with a misdemeanor for selling puppies without a license or fine Plaintiffs with strict civil penalties. However, Meloche did not pursue any of these criminal or civil options. Rather, he permitted Plaintiffs to simply pay the necessary fees, $1,020.95 total for the nine animals, and take them home once the necessary procedures had been conducted. After the animals were removed from the LMAS facility, Plaintiffs discovered that each had contracted an infection and required veterinary treatment. Plaintiffs eventually sold all the puppies, but allege that they received below market value.

## II.

A proper understanding of this case requires an examination of the Louisville/Jefferson County Metro Government Code of Ordinances ("LMCO") as it relates to the regulation of animal ownership and breeding.

---

[3] "Micro-chipping" is the process of inserting a tiny microchip into the animal's skin. If that animal is later recovered, a veterinarian or LMAS officer can scan the animal for the chip and that chip provides information regarding the animal's proper owner.

LMCO § 91.020 requires that any dog four months of age or older be licensed and have its license tag attached to a collar worn by the dog. The current annual licensing fee is $9.00 for altered dogs and $50.00 for unaltered dogs.

There are several relevant ordinance related to selling dogs. LMCO § 91.023 requires a license to operate a "Class A kennel."[4] A Class A kennel is defined by LMCO § 91.001 as:

> Any establishment where dogs and/or puppies or cats and/or kittens are kept for the primary purpose of breeding, buying, or selling such animals and which establishment is so constructed that the dogs, puppies, cats, and kittens cannot stray therefrom. The Class A Kennel or Cattery license shall apply to up to five dogs or cats and shall require an additional Class A Kennel or Cattery license for each increment of up to five dogs or cats.

LMCO § 91.142 requires that any advertising for the sale of animals within Jefferson County must contain the "owners, animal dealer, pet shop, kennel or cattery license number, and/or their individual dog, cat, or ferret or multiple cat household license number." Finally, LMCO § 91.027 states,

> (A) It shall be unlawful for any person required to be licensed under §§ 91.020 and 91.023, but who has not obtained such a license or permit, to sell, offer to sell, or to advertise the sale of an animal. Any electronic or print offer to sell, including a paid advertisement, shall include the license number of the licensed person making the offer.
>
> (B) It shall be unlawful for any person to sell, offer to sell, or to advertise the sale of an animal which is required to be licensed and vaccinated under §§ 91.020, 91.023, and 91.025, but which has not been licensed or permitted and vaccinated. Any electronic or print offer to sell, including a paid advertisement, shall include the license number of the animal offered for sale.
>
> . . .
>
> (E) In addition to a citation issued to the owner, any animal sold or offered for sale

---

[4] Defendant Meloche argues that Plaintiffs were also required to have an "animal dealer" license. However, that license only applies to individuals who sell animals for the purpose of resale. Nothing indicates that was the purpose of Plaintiffs' sales here.

in violation of this section may be impounded by MAS. The animal shall be released to the owner(s) only upon the obtaining of all required licenses or vaccinations, and the payment of all other redemption fees and costs provided under § 91.071.

Violations of the licensing requirements can result in criminal and civil penalties. LMCO § 91.999(A)(2) provides that

> any person violating any other provision of this chapter shall be deemed guilty of up to a Class B misdemeanor, so long as this is the party's first offense for any violation, and may be punished up to a $250 fine or imprisoned for a period not to exceed 90 days in jail, or both so fined and imprisoned. Each day a violation continues shall constitute a separate offense.

LMCO § 91.999(B) provides,

> (1) Any person who violates any of the provisions of this chapter shall be subject to a civil penalty. Any person cited pursuant to this subsection may pay the minimum civil penalty within seven days from the date of issuance or request a hearing of such penalty by the Code Enforcement Board ("Board") in accordance with §§ 32.275 et seq. If the person fails to respond to the citation within seven days as referenced above, the person shall be deemed to have waived the right to a hearing. In this event, the Board shall enter a final order determining that the violation was committed and impose the maximum civil penalty set forth in the citation.
>
> (2) Any person who violates any provision of any of the provisions of this chapter shall be subject to a civil penalty of not less than $150 nor more than $1,000. Penalties for each subsequent offense shall be cumulated as multiples of the number of previous offenses.

In addition to criminal and civil penalties, the ordinances also provide for impounding animals associated with licensing violations. As noted above, § 91.027(E) allows impoundment of any animal sold or offered for sale in violation of the Class A kennel licensing requirements. Furthermore, LMCO § 91.070(D) provides, " Any animal deliberately used to facilitate an act that is illegal under federal, state, or metro law shall be impounded."

Release of the animals following impoundment is also regulated by ordinances. LMCO § 91.071 provides,

5

(A) Every owner reclaiming an impounded animal which is subject to the terms of this chapter shall pay all redemption fees. Said fees shall be paid to MAS.

(B) Any dog or cat which is impounded under this chapter shall not be reclaimed unless the animal has a microchip inserted either by MAS or by a veterinarian in accordance with standards and specifications promulgated by the Director. If a microchip is inserted by the MAS the owner shall pay all fees specified under § 91.009, and all penalties and fines under § 91.999, of this chapter.

(C) Proof of vaccination against rabies and distemper, hepatitis, parainfluenza, parvovirus (DHPP) for dogs or against rabies and rhinotracheitis, calici, panleukopenia (FVRCP) for cats, or sufficient antibody titers for these diseases and an annual parasitic examination for internal parasites in the past 12 months, and a current license shall be required before any dog or cat is released. If no proof of vaccinations, parasite exam, or current license is shown, a rabies vaccination and/or parasite exam voucher(s) and/or license must be purchased before the animal is released. All vaccination/parasite exams must be administered to the animal within the prescribed time printed on the voucher(s). The administration of vaccinations may be deferred by the veterinarian at his or her discretion based upon his or her assessment of need or the health of the animal.

(D) Any unaltered dog or cat which is not licensed as required under this chapter, and which is impounded for any reason after the effective date of this chapter shall not be reclaimed by an owner unless the dog or cat is spayed or neutered by or at the direction of MAS. A dog or cat shall not be spayed or neutered pursuant to this subsection (D) if a veterinarian licensed by the Commonwealth of Kentucky sets forth in writing that such dog may not be spayed or neutered due to medical reasons. Nothing in this section shall preclude a determination pursuant to § 91.150 that a dog is a potentially dangerous dog or dangerous dog.

These ordinances are relevant throughout the Court's analysis of this case and the Court will reference the LMCO section number.

### III.

Before beginning an examination of each of Plaintiffs' causes of action, the Court must resolve one significant issue of statutory construction. Many of Plaintiffs' claims depend on the proper interpretation of the definition of a "Class A kennel" under LMCO § 91.001. Plaintiffs assert that they were not operating a Class A kennel and, therefore, were not required to obtain

any licenses prior to selling their puppies. If Plaintiffs interpretation is correct, then their claims may be viable. Defendants counter that Plaintiffs fall within the confines of a Class A kennel because of their decision to sell puppies and, therefore, had to be licensed. Assuming Defendants interpretation is correct, they argue that Plaintiffs were in violation of the law and the actions taken by Defendants were appropriate under the ordinances.

## A.

As is well-settled, the starting point for any statutory construction issue is the plain language of the statute. Where the plain language of the statute is clear, the Court's analysis need go no further. *See, e.g., Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002). Here, the ordinance can be broken down into several phrases. A license is required for:

(1) Any establishment

(2) where dogs and/or puppies are kept

(3) for the primary purpose of breeding, buying, or selling such animals, and

(4) which is so constructed that the dogs and puppies cannot stray therefrom.

An analysis of the plain meaning of these four elements shows that the ordinance applied to Plaintiffs and they were required to have a license to sell their puppies.

First, "establishment" is not defined by the LMCO. However, its regular, everyday usage indicates only a place or location. Webster's II New Riverside University Dictionary (1994) defines "establishment" as "a business firm, club, institution, or residence, including its members or occupants." *Id.* at 444. Plaintiffs' home certainly meets this definition as it was a "residence." Moreover, for the purposes of selling the puppies, the only purpose in question here, the Plaintiffs essentially ran a "business firm" from their home.

7

Second, there is no doubt that dogs and puppies were kept at Plaintiffs' home.

Third, "Plaintiffs decided to breed [their dogs]." (First Amended Compl. ¶ 12.) After breeding the dogs, "Plaintiffs placed an advertisement for the sale of the puppies in the Louisville Courier-Journal. On October 25, Plaintiffs renewed their ad. Plaintiffs received several calls about the puppies and, by October 30, had sold four of them." (*Id.* ¶ 14.) "Plaintiffs eventually sold [all of the] puppies." (*Id.* ¶ 29.) From these allegations, it is clear that Plaintiffs' "primary purpose" in keeping the puppies was to sell them. Thus, Plaintiffs meet the third element.

Finally, there is no argument that Plaintiffs' home was constructed in such a manner that the puppies could "stray therefrom." Thus, it is apparent that, as written, LMCO § 91.001 defining a Class A kennel applies to Plaintiffs as they attempted to sell dogs.

This conclusion is entirely reasonable and in keeping with the basic statutory scheme established by the ordinances. The ordinances require a license merely for owning an animal. Moreover, the ordinances place higher fees on the ownership of unaltered animals. Given these ordinances, it is apparent that Metro is concerned about controlling the pet population and keeping track of dog ownership within the city. Requiring licenses for individuals who market and sell puppies would clearly aid Metro in accomplishing that goal. Where the city requires a license merely for the ownership of a dog, it is only reasonable that the city would require a license to sell puppies. Thus, contrary to Plaintiffs' arguments, this interpretation of LMCO § 91.001 is consistent with the general statutory scheme of Chapter 91 of the LMCO. Where the Court is called upon to interpret a statute, "[t]he inquiry ceases if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Barnhart*, 534 U.S. at 450

(quotations omitted).

**B.**

Plaintiffs ask the Court to interpret the ordinance to apply only to an establishment that has the primary purpose of breeding or selling puppies. According to Plaintiffs, this interpretation would require only commercial breeders to obtain licenses. The Court finds that Plaintiffs' requested interpretation strains the plain language of the ordinance and requires changing its basic structure and wording. The language of the ordinance only requires that the primary purpose of keeping the dogs or puppies be to breed or sell them. It does not, on its face, require that the establishment itself have the primary purpose of breeding or selling dogs or puppies.

Plaintiffs also contend that it would be unreasonable to interpret the ordinance to apply to them because it would require them to comply with other regulations imposed on Class A kennels. The Court disagrees. Those other regulations, which primarily require certain paperwork be given to buyers and inspections by LMAS be allowed, do not make application of the ordinance to Plaintiffs unreasonable. All of those requirements appear in keeping with Metro's decision to regulate and control pet ownership.

**IV.**

With that foundation laid, the way is now clear for the consideration of Plaintiffs' claims individually.

Plaintiffs first allege multiple violations of their Fourth and Fourteenth Amendment rights. In essence, Plaintiffs claim that three actions of Defendants violated these rights. Plaintiffs alleges that: (1) the two undercover LMAS officers who came to their home to view

9

the puppies conducted an unlawful search; (2) when the additional officers re-entered the home to retrieve the animals, there was a second unlawful search; and (3) the seizure of the animals was unlawful. An analysis of these three claims, however, shows that the searches and seizures complied with federal constitutional standards.

**A.**

The first search was conducted pursuant to the valid consent of Plaintiffs. In *Lewis v. United States*, 385 U.S. 206 (1966), the Supreme Court found no Fourth Amendment violation where an officer, under the guise of being a drug buyer, entered the defendant's home with consent and searched the area for evidence of drug crimes. *Id.* at 210. The Court clarified that "[t]he fact that the undercover agent entered petitioner's home does not compel [a finding of a constitutional violation]." *Id.* The facts of this case are clearly analogous. Here, the LMAS officers contacted Plaintiffs to pursue the purchase of a puppy, much like the officer in *Lewis* contacted the defendant to pursue a purchase of drugs. Plaintiffs then willingly invited the LMAS officers into their home, just as the defendant in *Lewis* did. Finally, while in the home, the LMAS officers observed probable illegal activity (i.e. the sale of puppies without a proper license), much like the officer in *Lewis* did.

Based largely on dictum in *Lewis*, Plaintiffs argue that consent to undercover officers is only valid where the officers are investigating criminal activity. The Court does not believe that *Lewis* stands for such a proposition. Rather, the *Lewis* opinion is clearly based on the consent given by the defendant and his reasonable expectations of privacy, or lack thereof. "[W]hen, as here, the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were

carried on in a store, a garage, a car, or on the street." *Id.* at 211. As the Supreme Court clarified in *Maryland v. Macon*, 472 U.S. 463 (1985), a party does "not have any reasonable expectation of privacy in areas of [his] store where the public [is] invited to enter and to transact business." *Id.* at 469. Although *Macon* dealt with a store front, the explanation in *Lewis* clearly shows that a party who opens his or her home to the public as a business enjoys no greater expectation of privacy than the store owner. Thus, the LMAS officers were entitled to be in Plaintiffs' home based on the consent provided.

Even if Plaintiffs are correct that *Lewis* requires the officer enter with the intent to investigate a crime, the officers here did exactly that. LMCO § 91.999 makes it a crime to violate any ordinance related to the ownership or selling of animals within the city. As discussed above, under the plain language of the ordinance Plaintiffs were required to have a license to sell their puppies. They did not have one. Thus, they were in violation of LMCO § 91.027(A) and could be charged criminally under LMCO § 91.999. The fact that LMAS chose not to pursue criminal charges against Plaintiffs does not affect this analysis.

**B.**

Plaintiffs next contend that a second unlawful search occurred when the undercover LMAS officers exited the home and returned "a moment later" with additional officers to impound the animals. The parties agree that the issue presented is whether the officers actions were permissible under the doctrine of consent once removed. The Court finds that they were.

The consent once removed doctrine was adopted by the Sixth Circuit in *United States v. Pollard*, 215 F.3d 643, 649 (6th Cir. 2000). Under the doctrine, additional officers may enter a suspect's home based on the suspect's consent given to an undercover officer who previously

11

entered the home. The doctrine applies where "[t]he undercover agent or informant: (1) entered at the express invitation of someone with authority to consent; (2) at that point established the existence of probable cause to effectuate an arrest or search; and (3) immediately summoned help from other officers." In *Pollard*, an undercover officer went to the defendant's home to purchase drugs. The undercover officer brought several "back-up" officers to the buy and they waited outside. Once the defendant revealed the drugs, the undercover officer gave a signal and the "back-up officers, without knocking or announcing themselves, broke down the front door, entered and said, 'police, get down.'" *Id.* at 646. Despite being uninvited, failing to knock, and breaking down the door, the Sixth Circuit ruled that the officers' entrance was constitutional based on the consent given to the undercover officer. The Circuit held that "the back-up officers were acting within constitutional limits when they entered to assist [the undercover officer] since no further invasion of privacy was involved once the undercover officer made the initial entry." *Id.* at 649.

Our case differs only slightly from the facts of *Pollard*. Here, the undercover officers were invited in the home and, at that point, established probable cause to believe that the O'Neill's had violated the licensing requirements for selling puppies. Thus, the first two elements are clearly met. The officers here, however, did not signal for back-up immediately. Rather, they exited the home for "a moment" and then attempted to re-enter with additional officers. It is important, however, that the undercover officers never left the premises and that Plaintiffs clearly anticipated them re-entering the home. The undercover officers went to the front porch to "discuss purchasing a puppy" and would then inform Plaintiffs of their decision. Thus, the undercover officers were still on Plaintiffs' property with their consent and were

12

expected to reenter the home. The fact that the officers stepped outside to signal for back-up does not warrant a different result here than in *Pollard*. Just as in *Pollard*, there was "no further invasion of privacy" by the back-up LMAS officers than was occasioned by the two undercover officers' initial entry.

Plaintiffs argue that by walking out the door, the undercover officers lost Plaintiffs' consent to enter. The Court respectfully disagrees. First, the allegations make clear that the undercover officers still had permission to be on the property. In fact, Plaintiffs believed that the officers would reenter the home after making a decision about purchasing the puppy. Thus, Plaintiffs consent extended to the officers' reentry.

Moreover, the Court finds similar decisions of the Seventh Circuit persuasive on this issue. In adopting the consent once removed doctrine, the Sixth Circuit expressly followed Seventh Circuit precedent, including *United States v. Akinsanya*, 53 F.3d 852, 856 (7th Cir. 1995). In *Akinsanya*, an undercover informant was invited into the defendant's apartment to purchase drugs. After the defendant presented those drugs to the informant, the informant phoned the police that he had seen the drugs. The informant then told the defendant that he had to go get the money. A moment after the informant exited the apartment, officers entered, showing their badges and arresting the defendant. The Seventh Circuit applied the consent once removed doctrine holding, "When [the defendant] gave his consent to [the informant] to enter his apartment, he effectively gave consent to the agents with whom [the informant] was working. That consent was not withdrawn simply because [the informant] stepped out of the apartment moments before, or at the same time, the agents entered." *Id.* at 856. Based on this analysis, the fact that the undercover LMAS officers momentarily exited Plaintiffs' home to get assistance

13

does not create a constitutional violation when the remaining officers reentered. *See also United States v. Diaz*, 814 F.2d 454, 456 (7th Cir. 1987) ("[W]e hold that [the defendant] effectively consented to the second entry by virtue of his consent to [the undercover officer's] first entry. [The undercover officer] was in the hotel room with [the defendant's] consent, and the fact that [he] momentarily stepped out to obtain help from other officers in making the arrest did not vitiate this consent.").

## C.

Finally, Plaintiffs claim Fourth Amendment violations when the LMAS officers seized their dogs and puppies without a warrant. Under the "plain view" exception to the warrant requirement, "a warrantless seizure by police of an item that comes within plain view during their lawful search of a private area may be reasonable under the Fourth Amendment" where the officers have "probable cause to believe that the item in question is evidence of a crime or is contraband." *Arizona v. Hicks*, 480 U.S. 321, 323 (1987). Plaintiffs assert that the plain view exception does not apply for two reasons: (1) the officers were not lawfully in their apartment; and (2) the dogs were not evidence of a crime or contraband. The Court has already addressed the first issue and found that the officers were lawfully in Plaintiffs' home.

The dogs and puppies were evidence of a crime and were properly impounded under the LMCO. First, all of the animals could be impounded under LMCO § 91.070(D), which provides, "Any animal deliberately used to facilitate an act that is illegal under federal, state, or metro law shall be impounded." It was illegal under metro law for Plaintiffs' to sell the puppies

without a Class A kennel license.⁵ The dogs were, in essence, evidence of Plaintiffs' illegal activity. Under the ordinance, it was proper for the officers to seize the dogs. Second, the puppies could be impounded under LMCO § 91.027(E), which provides that "any animal sold or offered for sale in violation of this section may be impounded by [L]MAS." Because the puppies were being offered for sale without a proper license, the officers were permitted to impound them.

Under this analysis, Plaintiffs' Fourth and Fourteenth Amendment rights were not violated and those claims should be dismissed.

## V.

Next, Plaintiffs claim that their procedural due process rights were violated when Defendants altered their animals and forced Plaintiffs to pay release fees, all without proper notice and an opportunity to be heard. There are two distinct issues raised by this claim: (1) whether Plaintiffs were denied procedural due process when they were required to pay fees for the release of their animals; and (2) whether Plaintiffs were denied procedural due process when their adult dogs were altered. Neither of these issues presents a cognizable claim at this time.

As to the first issue, the Court has already determined that the dogs were properly and legally impounded. Thus, the seizure of the dogs, itself, cannot provide the basis for a procedural due process claim. After the dogs were seized, it was Plaintiff's choice to pay the fees necessary to regain custody of the dogs. They could have refused to pay the fees and challenged the impoundment. LMCO § 91.999(B)(1) provides that any person cited for violation

---

⁵ The Court certainly realizes that the "illegal activity" of Plaintiffs was minor in comparison to many of the cases cited and discussed herein. As explained more fully below, perhaps the LMAS could have exercised better judgment in its handling of this case. However, that fact does not change the analysis of whether Plaintiffs' constitutional rights were violated.

15

of ordinances related to animals may request a hearing. This is a public law and Plaintiffs are charged with knowledge of the law. Their choice to pay the fees in order to get a speedy return of the animals cannot be the basis for a procedural due process claim.

Second, Metro was entitled to alter the unlicensed adult dogs under the applicable ordinances. Again, LMCO § 91.999(B)(1) provides the opportunity for a hearing. Plaintiffs chose not to pursue that option. The dogs are only altered before their release. Thus, if requested, a hearing may be held before the animals are altered. As with the payment of the fees, it was Plaintiffs' choice to seek the recovery of their animals without moving for a hearing. Thus, there can be no violation of procedural due process here.

## VI.

Plaintiffs next claim substantive due process and equal protection violations against Meloche and Metro. They claim that altering their adult dogs was not rationally related to any legitimate governmental purpose. The Court finds that this claim is baseless and must be dismissed.

Plaintiffs argue that the ordinance requiring alteration of unlicensed adult animals before they are released from the pound discriminates between owners of altered dogs and owners of unaltered dogs without any rational basis. Plaintiffs premises this argument almost exclusively on a recent case from this district, *Louisville Kennel Club, Inc. v. Louisville/Jefferson County Metro Government*, No. 3:07-CV-230-S, 2009 WL 3210690 (W.D. Ky. Oct. 2, 2009). There, Judge Simpson found a provision requiring written approval of constraints for unaltered dogs unconstitutional because no written approval was required for altered dogs and there was no rational basis for discrimination. *Id.* at *8. However, the issue was not contested. In fact,

LMAS conceded that the provision was a "redundant nullity" and the Court determined it was merely a "legislative oversight." *Id.* Contrary to Plaintiffs' argument, *Louisville Kennel Club* does not stand for the proposition that there is never a rational basis for treating owners of unaltered dogs differently than owners of altered dogs.

Here, there is clearly a rational basis for such disparate treatment. On its face, it is impossible to impose the "alteration before release" requirement on all owners; by definition, the altered dogs have already been altered. Thus, in reality, all unlicensed dogs have to be altered before being released, meaning that all unlicensed dogs are treated similarly. Moreover, the government advances clearly legitimate purposes for the disparate treatment. Unaltered dogs pose the threat of reproduction, which could easily overpopulate a city that already has scores of animals in shelters and roaming the streets. An overpopulation of dogs is unhealthy and unsanitary. Obviously, altered dogs do not pose this threat. Thus, there is a sufficient basis for discriminating between owners of altered dogs and owners of unaltered dogs.[6]

## VII.

Finally, Plaintiffs present a number of state law claims. Like the federal constitutional claims, the Court finds that these claims are not viable based on the undisputed facts of the Complaint.

First, Plaintiffs allege that the LMAS officers' entrance onto their property constitutes trespass. The Court has already determined that the officers were legally permitted to be in

---

[6] Equally as important, an owner of an unaltered dog can avoid the mandatory alteration of his or her dog by simply licensing the dog as required by the LMCO. Licenses allow the government more control over such animals and more oversight of the pet population. When an owner pays $50.00 to license an unaltered dog, the government may reasonably assume that the owner will properly care for the animal and protect against unwanted reproduction. When an owner does not license his or her dog, the government does not know whether there is any proper care or control over the animal.

17

Plaintiffs' home based on Plaintiffs' consent. Where such a finding is made, there can be no state law trespass claim. *See Ingraham v. Blevins*, 33 S.W.2d 357, 359 (Ky. 1930) (finding that where a search is authorized by law it is not a trespass).

Second, Plaintiffs allege state law claims for conversion based on the confiscation and alteration of their animals. As explained above, however, Defendants were permitted to impound and alter the dogs. Where the action is legally permitted, or required by ordinance as is true here, it cannot support a claim for conversion.

Plaintiffs final claim is for the tort of outrage. The facts of this case are simply insufficient to allege a tort of outrage. As discussed above, Defendants were merely following the law and had a legal right to engage in the alleged conduct. Such actions, in absence of a showing of some bad faith or animus, which is not alleged here, cannot serve as the basis for an action premised on the tort of outrage.

**VIII.**

In addition to the non-viability of Plaintiffs' claims, the individual defendants have all moved to dismiss on the basis of qualified immunity. "Qualified immunity is an affirmative defense that extends to government officials performing discretionary functions." *Shehee v. Luttrell*, 199 F.3d 295, 299 (6th Cir. 1999) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982)). As the Sixth Circuit explained, "[u]nder this judicially created exception, government officials are immune from civil liability when acting in an official capacity if their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow*, 457 U.S. at 818).

Because the Court has found that no constitutional rights were violated, there is no need

for the Court to consider the remainder of the qualified immunity defense. *See Shehee v. Luttrell*, 199 F.3d 295, 300-01 (6th Cir. 1999). However, even if the individual defendant's actions were unconstitutional, there is certainly no clear case law establishing such unconstitutionality. Therefore, the individual defendants could not have violated any "clearly established constitutional rights of which a reasonable person would have known." *See Williams v. Commonwealth of Kentucky*, 24 F.3d 1526, 1533 (6th Cir. 1994) ("[I]n the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself."). Thus, the individual defendants are also entitled to dismissal on the basis of qualified immunity.

## IX.

Having conducted this examination, it is apparent that none of Plaintiffs' claims may proceed, including those pled in the proposed amended complaint. However, the Court understands Plaintiffs' frustration here. Plaintiffs genuinely believed they were allowed to breed their dogs and sell them without any license. When informed that this was not true, Plaintiffs were not offered the simple option of purchasing a license. Rather, Defendants took a comparatively harsh, but legally permissible, course of action. Defendants seized all of Plaintiffs' animals and went so far as to alter some of those animals against Plaintiffs' wishes. As discussed, these actions were permissible, but perhaps they were not prudent. Defendants could have handled the situation in many different ways that would have resulted in a more reasonable resolution of this case. Certainly, no party wants to be involved in a federal lawsuit claiming constitutional violations. Equally true, no animal owner wants his or her pet impounded and altered against his or her wishes for a relatively minor licensing violation. All

parties may have been better served with a modicum of discretion from the LMAS. Of course, that fact does not make Defendants' actions unconstitutional.

The Court will enter an Order consistent with this Memorandum Opinion.

cc: Counsel of Record